```
          UNITED STATES DISTRICT COURT
             DISTRICT OF MINNESOTA
           CIVIL NO. 23-3679 (DSD/ECW)
```

Becky Joseph,

        Plaintiff,

v.                                              **ORDER**

Thomas-Grace Construction Inc.,

        Defendant.

    This matter is before the court upon the motion for summary judgment by defendant Thomas-Grace Construction Inc. (TGC). Based on a review of the file, records, and proceedings herein, the court grants the motion.

## BACKGROUND

    This employment discrimination action arises from plaintiff Becky Joseph's resignation from TGC after a brief and tumultuous tenure with the company. TGC, a Minnesota corporation, provides construction and installation services for commercial and retail clients. Compl. ¶ 9. On November 14, 2022, TGC hired Joseph, a Michigan resident, as a Lead Installer. Bachman Decl. Ex. 8.

    Joseph attended training in Minnesota in December 2022, and in January 2023, TGC assigned her to a project in Las Vegas for Target Corporation. Joseph Dep. at 45:17-46:9, 52:2-5. In Las Vegas, Joseph was supervised by Gary Raney. Id. at 53:4-6.

After just one day on the job, Joseph complained to the superintendent of the project, Brent Palmer, and TGC's director of development, Nathan Klump, that she and Raney were at odds over project details. Bachman Decl. Ex. 12, at 2-3. Palmer responded that he appreciated her feedback and generally agreed with her approach to the project. Id. at 1. He noted that although Raney "has a slightly different take on the process," he had been successful on past projects. Id. Palmer asked Joseph to keep him informed. Id. Palmer also told her that she would soon move to working at night and would be supervised by Storm Timm who "has a very calm delivery and is incredibly approachable." Id. at 1-2. Joseph replied that she appreciated his response. Id. Despite not mentioning sex discrimination during communications with Palmer, Joseph now claims that Raney disrespected her because she is female. Joseph Dep. at 56:12-57:5; 64:1-65:18. It is unclear whether Raney expressly said that he believed Joseph was less capable because of her sex or that she simply perceived that to be the case because she was the only female on site. Id. at 56:17-57:10.

On January 11 - the very next morning - Joseph told Palmer that she was resigning effective February 3, 2023.[1] Bachman Decl.

---

[1] Joseph now claims that she told TGC that she resigned due to sex discrimination, ECF No. 41, at 112, but her resignation

2

Ex. 13. She complained that TGC misled her about her job duties and that TGC was unfairly punishing her by moving her to the night shift. Id. Internally, TGC noted that "it"[2] might "just not be a good fit" for Joseph and that the plan was always to train her on both day and night shifts. Id. In other words, her conflict with Raney was not the reason for the change in her schedule. Joseph maintained, however, that she was being retaliated against for complaining about Raney. Id. Ex. 14, at 4. Palmer assured her that the move to night shifts was not retaliatory, but rather part of her training as to overnight procedures. Id. at 3. Palmer told her that she was an asset to the company and that he welcomed her feedback. Id. at 1. Joseph was "relieved" and withdrew her resignation. Id.

Two days later, TGC learned that Joseph had some issues at her company-booked lodging. Id. Ex. 15. While complaining to hotel staff about a noisy neighbor, she apparently screamed and was disrespectful to the staff in violation of company policy. Id.; id. Ex. 6, at 50. TGC created an incident report but did not discipline Joseph. Malloy Dep. at 43:15-20.

---

email does not even allude to such discrimination. See Bachman Decl. Ex. 13.

[2] It is unclear whether "it" refers to the job site in Las Vegas or Joseph's employment with TGC.

On January 20, Joseph emailed Palmer again complaining about Raney. Id. Ex. 17, at 1-2. She claimed that he is "condescending/belittling" and "does seem to have old fashioned ideals when it comes to females and the [sic] work." Id. She noted that Raney said he would have "the guys" tend to a pallet building project. Id. at 2. She now contends that this last statement is evidence of sex discrimination, although she did not say so at the time. Palmer responded that her upcoming new assignment at another Target project in Sparks, Nevada, would be a welcome reset. Id. He also stated that TGC does not condone improper behavior and encouraged her to notify TGC of any "questionable situation" beyond Raney's acknowledged "natural grumpy human condition." Id.

A few days later, Joseph apologized to Palmer for complaining about Raney:

> I'm now beginning to see Gary as a kind man, maybe a little rough in approach when there is a lot going on. I disagree with some of his ways, but I am gaining a better understanding of why he does things in such a controlled manner. I feel embarrassed and ashamed at my reaction to Gary. I have a new respect for him and a new perspective. I am very sorry that I sent such an emotional email. I was wrong.

Id. Ex. 18, at 1-2. Palmer was encouraged by her email. Id. at 1. He told her that she has been a "great asset" to Raney. Id.

4

Ex. 19, at 2. Joseph reported that she and Raney "get along well" and that it has been a "pleasant final week." Id. at 1.

On February 6, Joseph began her assignment in Sparks. The next day, Palmer checked in to see how the Sparks project was going for Joseph. Id. Ex. 20. Joseph responded positively:

> Thank you for asking. Everything is going good. Blake, Adam, and Anthony (all that are here) have been great. It's a better beginning, I think, but I like Gary and would work with him again. I'm glad it all worked out.

Id. The same day, Joseph completed a survey in which she indicated that her onboarding process met her expectations and was satisfactory. Id. Ex. 21.

On February 9, Joseph backed into a vehicle while driving a forklift. Id. Ex. 22. Blake Hansen, Joseph's on-site supervisor, prepared an incident report, but it does not appear that Joseph was reprimanded. See id.

On February 22, Joe Cikotte stepped in as the day supervisor for the Sparks project. Id. Ex. 23. The same day, Joseph complained to TGC that Cikotte was "demeaning towards [her] and [her] experience" because he told her that he wanted things done "his way." Id. Ex. 25. Cikotte admitted that he can be a "prick" but that he was not aware of any issue with Joseph. Id. Ex. 23, at 1. On February 23, Joseph texted Cikotte that she would not be at work because she was not feeling well and "not in the mood to

5

be ostracized by you or Blake." Id. at 2. She also sent an email to Cikotte and Hansen noting that he referred to himself as a "prick" and that she would not tolerate being criticized or demeaned. Id. Ex. 28, at 2. As with previous complaints, the focus was on her belief that she was being disregarded and disrespected despite her industry experience. Id. She did not mention or allude to sex discrimination. See id. The issue was elevated to TGC's management, which decided to open an investigation.[3]

Matty Malloy, TGC's director of operations, told Joseph via telephone that she would be placed on paid administrative leave pending the outcome of the investigation, and that she had the option of moving to a different project and going home in the interim.[4] Malloy Dep. at 67:17-68:11. Joseph preferred to stay in Nevada, and TGC let her do so. Id. at 71:25-72:15.

On February 24, Malloy emailed Joseph with information she needed to provide for the investigation, including details as to how she believed Cikotte and Hansen acted inappropriately and

---

[3] Before doing so, Malloy wrote "We need to terminate her" in an email to her supervisor. Wilkinson Decl. Ex. 21. She quickly decided thereafter, however, that termination "was not the right course of action" and that an investigation was warranted. Malloy Dep. at 72:19-73:6.

[4] Joseph claims that she was suspended without pay, but the record does not support her position.

violating company policy. Joseph responded that Cikotte and Hansen dismissed her ideas and experience, minimized her in front of other employees, and did not allow her to perform her duties in the way she preferred. Id. Ex. 29, at 1. She also blamed them for the forklift accident, claiming that they disconnected the back-up alert that could have prevented the accident. Id. at 1-2. She wrapped up by stating that the "men are always right in the eyes of the company" and "treated as more valuable." Id. at 2. She stated that she was "standing up to their discrimination" and accused TGC of "retaliating" against her by putting her on paid administrative leave pending the investigation.[5] She did not expressly state that the alleged "discrimination" was based on her sex. See id. at 1-2.

Joseph's repeated negative emails while on the Sparks project concerned TGC. The messages within TGC regarding Joseph were, at times, poorly stated but demonstrate an unease with how to proceed given her erratic behavior. See Wilkinson Decl. Exs. 10, 23, 24, 25, 29. TGC's internal communications do not mention sex discrimination or any understanding that Joseph was complaining about sex discrimination. See id. Exs. 10, 23, 24, 25, 29. Nor

---

[5] Malloy testified that Cikkote and Hansen were not placed on leave because, as supervisors, they were needed onsite for the project to continue without disruption. Mallow Dep. at 69:6-71:6.

7

do those communications discuss or allude to Joseph's sex. See id.

Malloy interviewed Joseph on March 2, as part of the investigation. At no point during the nearly forty-minute interview did Joseph mention or even hint that she was subject to sex discrimination by Cikkote, Hansen, or anyone else at TGC. See id. Ex. 24. Instead, Joseph complained about misunderstandings regarding her job title and responsibilities and her lack of autonomy. See id. Joseph now claims that she did not mention sex discrimination during the interview because she had already mentioned it to Malloy "several times." Joseph Decl. ¶ 7. There is no evidence in the record that she did so aside from her post-suit statements.[6] See Joseph Dep. at 56:17-57:5; 64:4-12; 72:18-73:24; 74:6-75:24.

After also interviewing Cikkote, Hansen, and witness Michael Brocksen, TGC concluded that there was no evidence to support a finding that Cikkote or Hansen violated company policy. Lamm Bachman Decl. Ex. 30. TGC nevertheless decided to implement company-wide "Inclusive Communication" training to help foster a

---

[6] Moreover, given that the purpose of the interview was to allow Joseph to fully explain the bases for her complaints against Cikkote and Hansen, it seems odd that Joseph would have failed to mention sex discrimination. See Lamm Bachman Decl. Ex. 24.

respectful work environment and encourage reports of misconduct. Id. at 4. TGC notified Joseph of its decision and its determination that the Sparks project was not a good fit for her. Id. Ex. 31. Joseph was offered a new project in Orange, Connecticut, the only other jobsite available, in the same role with the same pay and benefits. Malloy Dep 69:10-7-:12; 139:17-40:17. Joseph rejected the offer, resigning instead. Id. Ex. 33.

On September 1, 2023, Joseph commenced this action in the Western District of Michigan, alleging sex and gender discrimination and retaliation in violation of Title VII and Michigan's corresponding Elliott-Larsen Civil Rights Act. ECF No. 1. On TGC's motion, the judge transferred the case to this court on November 28, 2023. ECF No. 11. TGC now moves for summary judgment.

## DISCUSSION

### I. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

9

(1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

**II. Discrimination Claim**

A plaintiff claiming discrimination must either present direct evidence of the discrimination or satisfy the three-part burden-shifting test presented in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).[7] Direct evidence can include

---

[7] The court analyzes discrimination and retaliation claims under Title VII and the ELCRA identically. Sutherland v. Mich.

10

"evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that attitude was more likely than not a motivating factor in the employer's decision." Yates v. Douglas, 255 F.3d 546, 548 (8th Cir.2001). However, "[n]ot every prejudiced remark made at work supports an inference of illegal employment discrimination." Rivers-Frison v. Southeast Mo. Cmty. Treatment Ctr., 133 F.3d 616, 619 (8th Cir. 1998). Courts distinguish between "stray remarks in the workplace, ... statements by decisionmakers unrelated to the decisional process, ... [and] direct evidence of discrimination." Id.

Here, Joseph contends that there is direct evidence of discrimination based on TGC's internal discussions of whether Joseph should be terminated following the complaints she made about her supervisors. See ECF No. 41, at 18-19; Malloy Dep. at 43:3-45:15; 67:17-23; 79:19-80:11, 83:9-85:19; 95:20-99:22; Wilknson Decl. Exs. 10, 17, 21. The court is not persuaded. The references she cites do not support the conclusion that animus based on Jospeh's sex or gender bore any relationship to TGC's handling of

---

Dep't of Treasury, 344 F.3d 603, 614 n.4 (6th Cir. 2003).

her complaints. Neither her sex nor gender is mentioned in TGC's internal communications about her employment. Indeed, her complaints did not address sex or gender discrimination, even read liberally.[8] She failed to even mention discrimination when interviewed at length by TGC regarding the bases of her complaints, despite being given ample opportunity to do so. The fact that she may have subjectively believed that she was subject to discrimination is insufficient to establish discriminatory animus. See Hein v. All America Plywood Co., Inc., 232 F.3d 482, 488 (6th Cir. 2000) ("[D]irect evidence [of discrimination] cannot be based on rumors, conclusory allegations, or subjective beliefs."); Montes v. Greater Twin Cities Youth Symphonies, No. 05-cv-866, 2006 WL 3386560, at *5 (D. Minn. Nov. 22, 2006) ("As a matter of law ... a Title VII plaintiff's subjective beliefs concerning allegedly discriminatory remarks cannot be considered direct evidence of discrimination.").

Absent direct evidence, as here, the court turns to the McDonnell Douglas test under which a plaintiff must first establish a prima facie case of discrimination. See id. The

---

[8] Although she mentioned that Raney had "old fashioned ideals" about women, she did not explain her comment and later defended Raney and apologized for speaking negatively about him. Under the circumstances, Joseph's vague comment about Raney does not support a finding of discriminatory animus by Raney or TGC.

12

burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. See id. at 692-93. If the employer puts forth such a reason, the plaintiff then must produce evidence demonstrating that the employer's reason is pretext for unlawful discrimination. See id. at 693.

To establish a prima facie case of sex discrimination, Joseph must show that she (1) is within the protected class, (2) was qualified to perform the job, (3) suffered an adverse employment action, and (4) has set forth facts that give rise to an inference of discrimination. See Briggs v. Univ. of Cincinnati, 11 F.4th 498, 508 (6th Cir. 2021); Takele v. Mayo Clinic, 576 F.3d 834, 838 (8th Cir. 2009); Higgins v. Gonzales, 481 F.3d 578, 589 (8th Cir. 2007) (Title VII), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011).

Only the latter two elements are at issue. Even assuming that being placed on administrative leave, being offered a job elsewhere within the company, and resigning due to perceived discrimination constitute adverse employment actions, the record is devoid of evidence tying TGC's decisions to any form of discriminatory animus. As already noted, there are no documents supporting Joseph's claim that TGC was motivated by unlawful discrimination. This includes the documents indicating, perhaps

13

indelicately, that TGC was concerned that Joseph was not a good fit for the company. None of those documents, however, mention or allude to Joseph's sex. Indeed, TGC's focus was on Joseph's near constant dissatisfaction with her job responsibilities and her belief that her supervisors did not value her previous experience. Joseph herself did not even assert that she was being discriminated against based on her sex or gender until she filed this lawsuit.

On this basis alone, the court must conclude that Joseph has failed to establish a prima facie case of sex discrimination. As a result, the discrimination claims must be dismissed.

**III. Retaliation Claim**

Like discrimination claims, to establish a prima facie case of retaliation under federal and Michigan law, Joseph must show (1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (3) there is a causal connection between the two. Jackson v. Genessee Cnty. Rd. Comm'n, 999 F.3d 333, 343-44 (6th Cir. 2021).

As did her discrimination claim, Joseph's retaliation claim rises or falls on the nature of her complaints. A person engages in protected conduct when she opposes acts that she reasonably believes violates Title VII or the ELCRA. Id.; Barker v. Mo. Dep't of Corr., 513 F.3d 831, 834 (8th Cir. 2008). Joseph

14

maintains that she engaged in protected activity by complaining to TGC about her supervisors. But none of those complaints, even broadly construed, included allegations that her supervisors were engaged in sex discrimination. When interviewed about her complaints, Joseph did not mention or allude to being subject to sex discrimination. As such, her complaints, which were based on her concerns about her job duties and her supervisors' perceived disregard for her previous work experience, do not amount to protected activity. Jackson, 999 F.3d at 343-44. As a result, Joseph's retaliation claims also fail as a matter of law.

## CONCLUSION

Accordingly, based on above, **IT IS HEREBY ORDERED** that:

1. Defendant's motion for summary judgment [ECF No. 35] is granted; and

2. This case is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  August 5, 2025          /s David S. Doty
                                David S. Doty, Judge
                                United Stated District Court